**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 25-cr-153 (AHA)** |
| | : | |
| **ASHANTI CRIDER,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The Defendant served as a straw purchaser for her boyfriend and co-defendant, a felon, and bought and gave ammunition to him. The Defendant bought the ammunition for her felon boyfriend the next day after a shooting the night before and she bought him the same caliber of ammunition that was used in the shooting. For the reasons stated herein, the Government respectfully requests that the Court sentence the Defendant to a sentence of eight months of probation that includes a combination of home detention and intermittent confinement, followed by three years of supervised release.

## <u>BACKGROUND</u>

On March 29, 2023, at approximately 12:51am, several Prince George's County, MD Police Department (PGPD) Detectives were in unmarked PGPD law enforcement vehicles on and around the 300 block of 37th Street SE, Washington, DC tracking a stolen vehicle that had fled a traffic stop earlier in the evening. PGPD Detectives were in the 300 block of 37th Street SE because a tracker on the carjacked vehicle had shown it was located in an alley between the 300 block of Anacostia Road SE and 300 block of 37th Street SE. As they were circling around 37th Street SE looking for the carjacked vehicle, one of the PGPD Detectives reported that his vehicle was struck by gunfire. ShotSpotter detected nine rounds that were fired. The PGPD detective did not sustain any injuries.

Six rounds were recovered, including two rounds that came from an assault rifle. Other parked vehicles on the street, including an Acura and Honda sustained bullet holes from the shooting.



*Image of a parked Acura that got hit during the shooting.*

Subsequent investigation by MPD, to include a review of surveillance video footage, revealed that at least two shooters discharged firearms at the passing PGPD vehicle from 324 37th Street SE, Washington, DC to include at least one shooter located in Apartment 101 of the apartment complex. Video footage from the apartment complex identified muzzle flashes coming from the window of Apartment 101, but the shooter was not identifiable.




*Still from surveillance camera showing multiple muzzle flashes from 324 37th Street SE, Apartment 101.*

On March 30, 2023, Superior Court issued a search warrant for Apartment 101, which MPD executed on April 4, 2023. The apartment appeared to be vacant. Inside the apartment, law enforcement recovered empty ammunition boxes, loose rounds of ammunition, and packaging for a large capacity magazine, amongst other items. Additionally, they found a receipt from “H and F Arms LLC” in Alexandria, VA which documented a debit card purchase from a bank card ending in 9487. From the receipt, investigators were able to identify the Defendant as the person who visited “H and F Arms LLC” and made a purchase of a box of “Tulammo” brand 7.62 ammunition, a box of .40 caliber ammunition, and a 60-round capacity AK47 magazine on March 29, 2023, later in the day after the shooting the night before.

A search of Defendant’s cell phone revealed that the Defendant and her co-defendant, Tariq Lassiter were present at Lassiter’s residence in the same building as Apartment 101 during the shooting. On March 29, 2023, at 12:52am (approximately one minute after the shooting at the PGPD Detective), the Defendant texted a contact saved as “Bestieee ♡”, “*I’m up 37th they just spinned bitch*”.

Several minutes later Defendant texted, "*Tariq mom going off….*", and at approximately 1:09am Defendant texted a picture of Tariq Lassiter's face. At 3:25am, Defendant sent an outgoing text stating, "*Girl he grab that drac…*", followed by "*And told me to duck*". "*Drac*" is likely a reference to a Draco firearm, which is a firearm similar to an AK-47 that accepts 7.62 ammunition and AK-47 magazines. Following the shooting, law enforcement recovered two 7.62 rounds at the scene of the shooting.

| Timestamp | From | To | Body |
|---|---|---|---|
| 3/29/2023 12:52:25 AM(UTC... | From: +12132989659 | To: +12023400283 Bestieee ♡ | I'm up 37th they just spinned bitch |
| 3/29/2023 12:56:46 AM(UTC... | From: +12023400283 | To: +12132989659 Ashanti' Crider (owner) | on whooooooooo |
| 3/29/2023 1:08:00 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | Bitch |
| 3/29/2023 1:08:11 AM(UTC-4) | From: +12023400283 | To: +12132989659 Ashanti' Crider (owner) | yes |
| 3/29/2023 1:08:13 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | They just drop Shit off |
| 3/29/2023 1:08:17 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | Tariq mom going off |
| 3/29/2023 1:08:23 AM(UTC-4) | From: +12023400283 | To: +12132989659 Ashanti' Crider (owner) | again? |
| 3/29/2023 1:08:40 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | No |
| 3/29/2023 1:08:54 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | She don't want him leave out she crying I'm telling him don't leave out bitch |
| 3/29/2023 1:08:59 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | I handcuff us together |
| 3/29/2023 1:09:01 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | 😂😂😂 |
| 3/29/2023 1:09:14 AM(UTC-4) | From: +12132989659 | To: +12023400283 Bestieee ♡ | |



| Timestamp | From | To | Body |
|---|---|---|---|
| 3/29/2023 3:16:04 AM(UTC-4) | From: +12028941482 | To: +12132989659 Ashanti' Crider (owner) | Omg Are You Ok 😭😭😭 |
| 3/29/2023 3:16:13 AM(UTC-4) | From: +12028941482 | To: +12132989659 Ashanti' Crider (owner) | Did He Stop 😭😭😭 |
| 3/29/2023 3:16:18 AM(UTC-4) | From: +12028941482 | To: +12132989659 Ashanti' Crider (owner) | |
| 3/29/2023 3:16:20 AM(UTC-4) | From: +12028941482 | To: +12132989659 Ashanti' Crider (owner) | That's So Ghetto |
| 3/29/2023 3:24:38 AM(UTC-4) | From: +13012838114 | To: +12132989659 Ashanti' Crider (owner) | U home yet |
| 3/29/2023 3:25:34 AM(UTC-4) | From: +12132989659 | | Girl he grab that drac 🤣 |
| 3/29/2023 3:25:38 AM(UTC-4) | From: +12132989659 | | And told me duck |
| 3/29/2023 3:25:48 AM(UTC-4) | From: +12132989659 | | That shit made me sooooo mf 😵‍💫 |
| 3/29/2023 3:25:50 AM(UTC-4) | From: +12132989659 | | 🤣🤣🤣🤣 |
| 3/29/2023 3:26:10 AM(UTC-4) | From: +12132989659 | To: +12028941482 Officer Hopkins | I'm geeking I like the handcuff sex |
| 3/29/2023 3:27:13 AM(UTC-4) | From: +17712011094 | To: +12132989659 Ashanti' Crider (owner) | Yess I wanna see the videoooooo bitchhh u gotta teach me some shitttssss |

Beginning on the morning of March 29, 2023, several hours after the shooting, the Defendant and Lassiter began to exchange text messages relating to Lassiter's request that Defendant drive him to the gun store in Alexandria, VA. At 12:24pm, Defendant texted Lassiter, "*Where the place Tariq*" and Lassiter responded with a photograph of a piece of paper which contained the store name and address for H & F Arms LLC. At 12:31pm Defendant responded, "*We not going that far…*" and Lassiter subsequently replied, "*Shit ain't that far…That joint got da best prices…*"

| Timestamp | From | To | Body |
|---|---|---|---|
| 3/29/2023 12:22:59 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | I already kno da place |
| 3/29/2023 12:23:07 PM(UTC... | From: +12132989659 | To: +13012838114 Tariq | Where at |
| 3/29/2023 12:23:18 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | I am gettin ready rn Ashanti chill stop assuming da worst & doubting me |
| 3/29/2023 12:23:23 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | I kno u got shit to do |
| 3/29/2023 12:24:57 PM(UTC... | From: +12132989659 | To: +13012838114 Tariq | Where the place tariq |
| 3/29/2023 12:30:03 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | |
| 3/29/2023 12:31:47 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | |
| 3/29/2023 12:33:35 PM(UTC... | From: +12132989659 | To: +13012838114 Tariq | We not going that far like bffr |
| 3/29/2023 12:33:56 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | Shit ain't that far |
| 3/29/2023 12:34:04 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | That joint got da best prices |
| 3/29/2023 12:34:10 PM(UTC... | From: +13012838114 | To: +12132989659 Ashanti' Crider | Why u gotta b so difficult |




Defendant and Lassiter continued to exchange text messages about their planned trip to the gun store, and at 12:43pm Defendant texted Lassiter, "*Outside*", with Lassiter responding, "*Coming and got u*" at 12:46pm, followed by "*Walking out dirt", "Door*" at 12:50pm. A forensic search of Defendant's phone revealed that at 3:20pm (approximately ten minutes before Defendant purchased an AK47 magazine and ammunition), an Apple Notes entry was created in her phone which stated the following, "*Ak47 60 round clip, 3 box of 20 762 bullets, 50 box of.40 bullets, Marx Jackson 052586*".

» Note Go to

| | |
|---|---|
| **Title:** | Ak47 60 round clip |
| **Creation time:** | 3/29/2023 3:20:38 PM(UTC-4) |
| **Modification Time:** | 5/14/2023 8:19:27 PM(UTC-4) |
| **Last Modifier :** | |
| **Source:** | Notes |
| **Account:** | 4E91D1E7-2E83-448B-951F-A65A257CC571 |
| **Extraction:** | Advanced Logical |
| **Source file:** | Shanti /mobile/Containers/Shared/AppGroup/group.com.apple.notes/NoteStore.sqlite : 0x2F621C (Table: ZICCLOUDSYNCINGOBJECT, ZICNOTEDATA; Size: 3133440 bytes) |

**Summary**

3 box of 20 762 bullets

**Body** HTML Text

Ak47 60 round clip
3 box of 20 762 bullets
50 box of .40 bullets

Marx jackson 052586

Surveillance footage from inside the store identified Defendant inside purchasing ammunition and an AK47 magazine with a combination of cash and a debit card, and at 3:28pm, Defendant appeared to hold and orient her phone towards a box of ammunition, indicative of Defendant using her cell phone camera to display the item to someone else via a video call. The Defendant's cell phone revealed that at the same time of 3:28pm, a FaceTime call was initiated between Defendant and Lassiter.




Surveillance footage and the gun store's records confirmed that the Defendant purchased one box of "Tulammo" brand 7.62 ammunition, a box of .40 caliber ammunition, and a 60-round capacity AK47 magazine. After the Defendant purchased these items, she drove back to Washington, D.C. with Lassiter. The packaging for the magazine and the empty box containing the "Tulammo" brand of 7.62 ammunition were recovered in the vacant apartment when it was searched on April 4, 2023. The Defendant's cell phone also revealed a conversation where she discussed with Lassiter how many years he was previously imprisoned, demonstrating her knowledge that when she bought ammunition for him on March 29, 2023, she knew he was a convicted felon and prohibited from possessing ammunition.

Finally, on May 22, 2023, MPD officers arrived at the Defendant's workplace to execute a seizure warrant for the Defendant's cell phone. At 4:05pm, the Defendant sent a text stating that

"Police at my job…They pulled me". Two minutes later at 4:07pm, she deleted all her text messages with Lassiter, which were later forensically recovered.

**PROCEDURAL HISTORY**

On May 22, 2025, the Defendant and Tariq Lassiter were charged in a four-count indictment in the U.S. District Court for the District of Columbia for Count 1) Conspiracy to Unlawfully Transfer Ammunition to a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 USC §§ 371, 922(d)(1), 922(g)(1); Count 2) Unlawful Transfer of Ammunition to a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 USC §§ 922(d)(1), 924(a)(8); Count 3) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 DCC § 2506.01(b)[1]; and Count 4) Tampering With Physical Evidence, in violation of 22 DCC § 723. The Defendant was charged in all counts. On May 27, 2025, the Defendant was arrested and released on bond. On July 17, 2026, the Defendant pleaded guilty to Count One of the Indictment pursuant to a plea agreement.

**SENTENCING GUIDELINES**

The Government concurs with the Pre-Sentence Report ("PSR") calculation that the Defendant's base offense level is 14, with a two-point enhancement for Obstruction of Justice, pursuant to USSG §3C1.1, and a three-point reduction for Acceptance of Responsibility pursuant to USSG §§3E1.1(a) and (b). PSR at ¶¶ 25-33. The Government also concurs that the Defendant is eligible for a zero-point offender adjustment. PSR at ¶ 34. Thus, based upon the final PSR released on August 4, 2026, the resultant total offense level of 11, along with a Criminal History Category of I, results in a corresponding range of imprisonment under the Guidelines of 8 months to 14 months.

[1] The government has dismissed this count.

**LEGAL STANDARDS**

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the Defendant, and to provide the Defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5) any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to

"ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section 3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 8 months of probation that includes a combination of home detention and intermittent confinement followed by 3 years of supervised release in this case is appropriate given the Defendant's conduct in knowingly buying ammunition for a convicted felon who could not legally buy the ammunition himself, and the attempt to cover up this crime.

### 1. The Nature, Circumstances, and Seriousness of the Offense

Gun violence is one of the most serious threats to the everyday lives of community members and citizens of Washington D.C. Preventing felons from obtaining guns and ammunition is a paramount priority for law enforcement, and knowing circumvention of that priority must be treated seriously. Here, the Defendant knowingly enabled her co-defendant with more ammunition, likely

in response to Lassiter's need to resupply the 7.62 rounds of ammunition that were discharged the night before when he or his associates shot at the PGPD unmarked cruisers.

**2. The Defendant's History and Characteristics**

The Defendant has no criminal history, to her credit. In large part due to this factor, the government is recommending a probationary sentence that includes a combination of home detention and intermittent confinement so she can continue to find employment and financially support herself and her young child. For example, if she finds employment Monday through Friday, intermittent confinement will allow her to serve her sentence only on the weekends until she satisfies the term of sentence.

**3. The Need to Promote Respect for the Law and Deterrence**

While the Defendant's specific action here only involves the straw purchase of ammunition for her felon co-defendant, this investigation began with the reckless and senseless shooting of PGPD unmarked cars as they drove through the 37th Street neighborhood. Investigators believe those cars were shot at because certain residents of that building perceived the unmarked cars as belonging to rival crew members. The Defendant's text message admits that Lassiter pulled out a Draco that night and told her to duck. A Draco was used in the shooting because of the 7.62 rounds recovered and that specific ammunition was requested and purchased by the Defendant later in the day. The Defendant's deliberate deletion of her text messages with Lassiter once MPD showed up to her workplace with a seizure warrant is also indicative of her consciousness of guilt. This specific act demonstrates a lack of respect for the law.

**CONCLUSION**

The Defendant bought ammunition for a convicted felon, knowing it was illegal, and attempted to impede an investigation into her crime. For the foregoing reasons, the Government recommends that the Court sentence the Defendant to eight months of probation that includes a

combination of home detention and intermittent confinement followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO UNITED
STATES ATTORNEY

By: */s/ Iris Y. McCranie*
IRIS Y. MCCRANIE
Assistant United States Attorney NY Bar
No. 5011234
601 D Street, NW Washington,
DC 20530
(202) 252-7828
Iris.mccranie@usdoj.gov